**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **DEANGELO MOODY,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:17-cv-01452** |
| | ) | **Judge Trauger** |
| **MIKE PARRIS, Warden,[1]** | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM

DeAngelo Moody is currently serving a sentence of life in prison based on his May 12, 2011 conviction by a Davidson County, Tennessee jury of first-degree felony murder. On November 15, 2017, he filed his pro se petition for the writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Doc. No. 1.) The respondent thereafter filed an answer to the petition (Doc. No. 8) and the state court record (Doc. No. 7), and the petitioner filed a reply to the respondent's answer (Doc. No. 15).

This matter is ripe for the court's review, and the court has jurisdiction. The respondent does not dispute that the petition is timely, that this is the petitioner's first Section 2254 petition related to this conviction, and that the claims of the petition have been exhausted. (Doc. No. 8 at 1–2.) Having reviewed the petitioner's arguments and the underlying record, the court finds that an evidentiary hearing is not required. As explained below, the petitioner is not entitled to relief under Section 2254, and his petition will therefore be denied.

---

[1] In light of the petitioner's transfer to the Morgan County Correctional Complex, the appropriate respondent to his petition is the warden of that facility, Mike Parris. Rule 2(a), Rules Gov'g Section 2254 Cases.

# I. PROCEDURAL HISTORY

The petitioner was indicted on December 3, 2009, along with Martez Matthews and Lorenzo Ortago Thomas, for the killing of Loren Michelle Johnson during the perpetration of or attempt to perpetrate a first-degree murder, and for employing a firearm during the commission of a dangerous felony. (Doc. No. 7-1 at 4–7.) The petitioner, his co-defendants, and the victim were all minor teenagers in 2009. After being tried jointly with Matthews before a jury (Thomas was tried separately), the petitioner was acquitted of the firearm charge but convicted of first-degree felony murder. (Doc. No. 7-7 at 3–4.) The trial court sentenced the petitioner to life in prison. (Doc. No. 7-1 at 48.)

On direct appeal, the petitioner argued that the evidence at trial was insufficient to support a guilty verdict. (Doc. No. 7-10 at 4.) The Tennessee Court of Criminal Appeals (TCCA) rejected this argument and affirmed the judgment of the trial court. *See State v. Moody*, No. M2011-01930-CCA-R3-CD, 2013 WL 1932718 (Tenn. Crim. App. May 9, 2013). The Tennessee Supreme Court denied discretionary review on October 7, 2013. (Doc. No. 7-13.)

Petitioner filed a pro se petition for post-conviction relief on April 21, 2014. (Doc. No. 7-14 at 29–35.) Following the appointment of counsel and an evidentiary hearing, the post-conviction trial court denied relief on multiple claims of ineffective assistance of trial counsel, but granted relief and ordered a new trial based on its finding that counsel was constitutionally ineffective in failing to interview and call Ortago Thomas to testify at the petitioner's trial. (*Id.*) The state filed an appeal from the grant of post-conviction relief, arguing that the trial court erred in finding that trial counsel was constitutionally ineffective. (Doc. No. 7-22.) The petitioner responded in defense of the trial court's judgment, but did not appeal its rulings on his unsuccessful ineffective assistance claims. (Doc. No. 7-21.)

On March 2, 2017, the TCCA reversed the trial court's grant of post-conviction relief and reinstated the judgment against the petitioner. *Moody v. State*, No. M2015-02424-CCA-R3-PC, 2017 WL 829820 (Tenn. Crim. App. Mar. 2, 2017). The petitioner filed for permission to appeal to the Tennessee Supreme Court, which was denied on June 9, 2017. He filed his pro se petition under Section 2254 in this court on November 15, 2017.

## II. STATEMENT OF FACTS

### A. Evidence at Trial

On April 25, 2009, sixteen-year-old Loren Johnson was struck by stray gunfire and killed as she laid in her mother's bedroom inside the family home, located at 3652 Chesapeak Drive. Her mother, Inez Johnson, testified that she was lying on the bed with her daughter when they heard gunshots, and "instead of laying low and rolling from the bed, [the victim] raised her body up" and was struck by a bullet. Although paramedics responded to the scene and took the victim by ambulance to the hospital, she died from her injuries. *State v. Moody*, 2013 WL 1932718, at *1.

Officer Christopher Cote of the Metro Nashville Police Department (MNPD) testified that he arrived at the scene after the paramedics. He testified that, when Officer Brian Eaves arrived at the scene, a witness approached Eaves and gave him a hat that the witness had found. Officer Cote also testified that he found multiple shell casings of different calibers at the scene. *Id.* at *2. A crime scene investigator, Lynne Mace, testified that her investigation of the scene revealed that there were two .45 caliber automatic casings and six 9mm casings. *Id.*

The state then called Christopher Bridges to testify. He testified that he lived at 3648 Chesapeak Drive, and described the events surrounding the shooting as follows:

> He stated that on April 25, 2009, at approximately 4:00 p.m., he was walking down Chesapeak Drive with Deandre Williams. As they were walking, a car with four or five people inside of it pulled up and began shooting. Christopher began to run, but he heard more than five shots fired. The State showed him a photograph of a vehicle

and asked if it was the vehicle he observed on April 25, 2009, to which Christopher responded, "Yes, sir." Christopher stated that he was given the opportunity to speak with the police about what he observed, but he told them that he "really didn't see anybody, didn't see anything." He said that he did not want to speak with the police and that they forced him to go to the precinct. Christopher admitted that in April 2009, he was a member of the 107 Underground Crips but denied that he was still a member.

On cross-examination, Christopher testified that he did not know why someone would want to shoot at him. He stated that the shooting came from the driver's side of the vehicle. He did not know appellants [Moody and Matthews] and said that the first time he saw them was on the news. Christopher stated that he had an adequate opportunity to view the car because it passed him and made a u-turn. He said that the vehicle's license plate was in the window and that the vehicle's bumper was not damaged. Christopher later testified that the vehicle that he identified in the photograph had damage on its bumper. Christopher said that he ran between some houses when the people in the vehicle started shooting; however, the victim's house was not one of them.

*Id.*

The next witness, Deandre Williams, testified that he had lived with Christopher Bridges in April 2009 and was with him on April 25. *Id.* Williams further testified as follows:

On April 25, 2009, he was walking to a friend's house with Christopher when he heard gunshots. He ran away and was unable to see from where the gunshots originated. He stated that he was sending text messages on his cellular telephone and did not observe any nearby vehicles or people. However, he recalled telling the police that he saw a small blue or green vehicle that looked like a Honda. He explained that he saw the vehicle before he and Christopher began walking. Mr. Williams further testified that he heard more than five gunshots. He estimated that he was three houses away from 3652 Chesapeak Drive when the gunshots began. He ran in the opposite direction from the victim's house.

Mr. Williams denied being a member of or affiliated with the 107 Underground Crips. He stated that he did not know whether Christopher was a member of the gang and denied noticing a tattoo of a gun with the numbers "107" on Christopher's hand.

On cross-examination, Mr. Williams testified that he did not know appellants and had never seen them before the day of trial. Mr. Williams did not know why anyone would shoot at him. He stated that he did not know anything about the incident and was only testifying because the State forced him to do so.

*Id.* at *2–3.

Evan Bridges, Christopher's father, was next to testify. He was in the backyard of his home at 3648 Chesapeak Drive when he heard gunshots and moved toward his front yard. *Id.* at *3. Upon arriving at his front yard, Evan Bridges was able to determine that the gunshots were coming from a small green car that was driving down the street, in which he "observed the heads of three African-Americans" who appeared to be "some young guys." *Id.* "When shown a photograph of a vehicle, Evan stated that the vehicle in the photograph was the same size, but the car he saw on the day of the shooting looked like a Honda." *Id.* He testified that "[a]pproximately fifteen to twenty minutes after the shooting ceased, [he] found a black cap in the middle of the street that was not there before the shooting" and gave it to the police. *Id.* Evan Bridges testified on cross-examination that he did not actually see anyone fire a weapon, and further clarified that the vehicle he saw was green while the vehicle in the photograph appeared to be blue. *Id.*

The state next called Quontez Caldwell, who provided the following testimony:

Quontez Caldwell testified that appellant Moody and Ortego Thomas are his halfbrothers through their father, but he only became acquainted with them a short time prior to this incident. Mr. Caldwell stated that on April 25, 2009, appellant Moody and Mr. Thomas picked him up from his grandmother's house in appellant Moody's vehicle. He identified appellant Moody's vehicle from an exhibit photograph. In addition to his half-brothers, two other males whom he did not know were in the vehicle. He identified appellant Matthews in the courtroom as one of the other passengers in the vehicle. Mr. Caldwell stated that as they drove down Chesapeak Drive, the people in the car saw "somebody they had a beef with [sic][,] and they shot at them." He recalled that Mr. Thomas said, "'There go [sic] somebody we beefin' with [sic].'" The driver then turned the vehicle around and drove back up Chesapeak Drive. He said that appellants and Mr. Thomas began shooting at a person he knew as "C. Trigger." Mr. Caldwell did not recall having previously testified that appellant Matthews had a 9mm pistol, that appellant Moody had a ".45 or .40," or that Mr. Thomas had a "38 revolver," but he acknowledged that if he had previously so testified, then it was the truth. He stated that neither he nor the driver had a weapon that day. After the shooting, the men dropped Mr. Caldwell off in the middle of the street. He said that he did not speak with appellants about the shooting after it happened.

Mr. Caldwell stated that the police attempted to interview him. The first two times they attempted to speak with him, he told them that he did not know anything about

5

what happened because he just "didn't want to tell them nothing [sic]." Mr. Caldwell denied being a member of the Hoover Deuce Crips. He denied testifying to being a member in July 2009 and said that if his being a member of the Crips was reflected in his statement, it was not the truth.

On cross-examination, Mr. Caldwell denied that a detective with MNPD brought him in for questioning because he had received information that Mr. Caldwell had claimed that he killed the victim. He further denied getting a new "teardrop tattoo" on his face. Mr. Caldwell did not recall telling the detective that he was anywhere near Chesapeak Drive, that he was with someone named "T.O.," that he was in a Chevrolet Impala, or that he did not know the color of the Impala. He stated that he did not know appellant Moody's real name and that he only knew his father by the name "Tango."

Mr. Caldwell admitted that he spoke with another detective a few weeks later but denied that he changed his story about being in an Impala with T.O. Mr. Caldwell admitted that appellant Moody picked him up and then proceeded to pick up another person, at which time the other person began driving the vehicle. He remembered seeing "C. Trigger" and stated that "guns were pulled[,] and they started shooting." In a subsequent interview with Kathy Morante, an assistant district attorney, Mr. Caldwell denied any knowledge of his brothers' having problems with "C. Trigger" and stated, "I didn't know they had no [sic] beef with him." He testified that his problem with "C. Trigger" was "[s]omething about ... some child issues" and that it was not significant. Mr. Caldwell denied that the "child issues" concerned his child's mother and could not remember stating that there was bad blood between him and "C. Trigger" or indicating that "C. Trigger" had tried to do him harm in the past. He declined the opportunity to review the transcript of his statement.

*Id.* at *3–4. Mr. Caldwell testified as a cooperating witness pursuant to a "use immunity" agreement. Assistant District Attorney Kathy Morante testified that such agreements precluded the prosecution from using any information provided by the witness unless it is determined that the witness is being untruthful. *Id.* at *4. She testified that "the most serious charge Mr. Caldwell faced in the summer of 2009, when he was fifteen years of age, was an attempted homicide that was unrelated to the instant case," and that he had been in the custody of the Department of Children's Services based on other criminal acts until just before the incident on April 25, 2009. *Id.* at *4–5.

The state proceeded to put on the following proof through lay and expert witnesses:

Detective Gene Davis of the MNPD testified that on May 15, 2009, he conducted a traffic stop in the area of Nolensville Road for a traffic ordinance violation. He

observed three people inside the vehicle he stopped, and during a search of the vehicle, he found a loaded 9mm Glock semi-automatic pistol. Detective Davis stated that appellant Matthews claimed ownership of the weapon, at which time he was taken into custody. Detective Davis identified the weapon, which was entered as an exhibit. He also identified appellant Matthews, who was seated in the courtroom.

Detective Cody O'Quinn of the MNPD testified that he was involved in serving a search warrant for a vehicle located at 314 Kern Drive on June 18, 2009. The vehicle was a green 1999 Kia. He determined that the vehicle was registered to appellant Deangelo Moody and his mother. He identified the temporary drive-out tag found inside the automobile and noted that it would have been valid on the date of this incident, April 25, 2009. On cross-examination, Detective O'Quinn stated that the Kia automobile in the exhibit photograph appeared green in color to him.

Detective Lawrence Brown, also from the MNPD, testified that he obtained buccal swabs from both appellants on February 9, 2011, at the prosecutor's request. He explained that a buccal swab is used to obtain liquid evidence, usually saliva, from an individual. The swabs were packaged and taken to the Tennessee Bureau of Investigation ("TBI") to be analyzed for DNA comparison.

Agent Mark Dunlap of the TBI Crime Laboratory was accepted by the trial court as an expert in forensic chemistry and serology. He testified with regard to his DNA analysis of a black cap. From his testing, he determined that the "DNA profile from the cap was a mixture of genetic material from two individuals." From the standards submitted in February 2011, ten of the thirteen testing sites indicated that the major contributor of DNA on the cap was appellant Matthews.

On cross-examination, Agent Dunlap explained that three of the thirteen testing sites were inconclusive, stating, "[T]here just wasn't enough DNA there to obtain a full profile, so those sites didn't yield results. It doesn't mean that they didn't match, it just means there was no result at those sites." He acknowledged that no DNA belonging to appellant Deangelo Moody was found on the hat.

Agent Robert Daniel Royse of the TBI Crime Laboratory was accepted by the trial court as an expert in firearms and tool mark identification. He explained the operation of the Glock 9mm Luger semiautomatic pistol, the parts of a live cartridge, and the firing cycle process. Agent Royse testified that in his work, he examines the unique set of markings found on every firearm, which can be thought of as a mechanical fingerprint. In making an identification, he test fires the weapon and takes the test bullets and cartridge cases and compares them to the evidence. If the unique characteristics are present on both the evidence and the test material, he concludes that they have a common origin and that they were fired from the same weapon. Agent Royse was provided six spent .45 caliber automatic cartridge casings and two 9mm cartridge casings in April 2009, and in January 2011, he was

provided a 9mm weapon for analysis. He testified that the two 9mm casings provided to him were fired from the weapon he received in January 2011.

*Id.* at *5.

After the prosecution rested, the defense called William Jackson, a former MNPD officer who testified that he was the lead detective investigating the victim's death. Detective Jackson testified that he "was present during the victim's autopsy and collected the bullet recovered from the victim's body as evidence." *Id.* at *6. Detective Jackson further testified as follows:

He recalled testifying at appellants' detention hearing that the recovered bullet was a large fragment and stated, "I didn't know at the time if it was a[.]45 or a[.]40[.] I guessed that it was one of those too big to be a[.]38 or a[.]22."

Detective Jackson testified at length concerning his three interviews with Quontez Caldwell. He recalled that his first interview with Mr. Caldwell was at the end of April and the second interview was on June 12th. He explained that he uses conversation as his interviewing technique to get to the truth. He would not make promises of assisting in getting charges dismissed or lowered, but he acknowledged that he would "talk for someone if they cooperate" and admitted that "[he did not] know how the [District Attorney] works."

On cross-examination, Detective Jackson recalled that during the first interview with Mr. Caldwell on April 30, 2009, Mr. Caldwell denied being at the scene or having anything to do with this incident. During the second interview on June 12, 2009, Mr. Caldwell began to cooperate and identified appellant Matthews in a photograph array as one of the individuals involved in this shooting. Detective Jackson testified that ultimately, Mr. Caldwell provided seating positions in the vehicle and stated that appellants were two of the three people involved in shooting at Christopher Bridges and Deandre Williams on April 25, 2009.

*Id.*

B. Testimony at the Post-Conviction Hearing

The evidence received in the post-conviction trial court pertaining to the sole issue on appeal—trial counsel's ineffectiveness vis-à-vis co-defendant Ortago Thomas—was described by the TCCA as follows:

Ortago Thomas testified that he was indicted as a co-defendant and that his case was severed from the petitioner's. He pled guilty to a lesser charge of second degree

murder in exchange for a sentence of fifteen years. Mr. Thomas claimed that the petitioner was not involved in the murder and that "it was just [Mr. Thomas] and [Mr.] Caldwell [who] was doing the shooting." Mr. Thomas elaborated:

> [The petitioner] didn't know what was going on because (unintelligible) fact that Caldwell was telling us to take him home, we was taking him home then, he went down—he was giving us directions, we went down the wrong street, and then we seen the two individuals that was shooting at, and then didn't nobody know what was going on because they the only one shootin' at people.

Asked why the petitioner did not know there was going to be a shooting, Mr. Thomas responded, "Simple fact he didn't have no gun or nothing, because only one had a gun was me, Caldwell and Matthews, was the only one." Mr. Thomas stated that they were taking Mr. Caldwell home, one street over, when the shooting occurred. Asked what happened, Mr. Thomas responded:

> Simple fact when the two individuals shooting at, one of them was reaching, I shot in the air to try to get him away and told the driver to go on drive off so we can go on get away, then all of a sudden I see Caldwell reach under the seat, ... driver's seat and grab Matthews' gun and his gun start shooting over the roof, and Matthews done grabbed the gun, tried to grab the gun from him.

Mr. Thomas claimed that, while the case was pending, he told his lawyer, his family, and the petitioner's family about what had happened. Mr. Thomas stated that he wanted to testify at the petitioner's trial that he was the one responsible for the victim's murder, but no one would let him take responsibility.

Mr. Thomas acknowledged having initially told the police that he had nothing to do with the crime and that he was not there when it happened. He then eventually told the police that he was in the car, had a .38 caliber gun, and that he fired the gun. Mr. Thomas stated that Mr. Matthews had a nine-millimeter gun, but Mr. Caldwell was shooting it. Mr. Caldwell was also shooting his own .45 caliber gun as well. He recalled that the victim was killed by a .45 caliber bullet. Mr. Thomas agreed that his testimony would have essentially been that the petitioner did not have a gun at the time of the offense.

The petitioner testified regarding counsel's representation of him and his various interactions with counsel. The petitioner stated that he asked counsel to investigate statements made by Quontez Caldwell, but counsel failed to do so. According to the petitioner, Mr. Caldwell was overheard at his high school bragging about the murder, and students at the school could have testified about the statements. However, the petitioner acknowledged that the police investigated the alleged statements and could not find any witnesses who heard Mr. Caldwell bragging

about the murder. The petitioner did not provide any testimony concerning Mr. Thomas.

Trial counsel testified that it was clear that the petitioner was not the shooter, but counsel was not "able to convey with a degree of understanding the concept of criminal responsibility or ... facilitation" to the petitioner. Counsel recalled that Mr. Caldwell, a witness for the State, "changed his story a lot" and at one time said that the petitioner had fired a weapon. However, the petitioner was acquitted on the gun charge, indicating that the jury based the petitioner's murder conviction on a theory of criminal responsibility. Counsel stated that his review of the discovery materials showed that Mr. Caldwell was the only person who stated that the petitioner was shooting. The discovery also indicated that Mr. Caldwell had made self-incriminating statements at his high school. Counsel spoke to people at Mr. Caldwell's school and obtained Mr. Caldwell's interview statements to police.

Counsel testified that he was unsure why Mr. Thomas' case was severed from the petitioner's. However, at one point, he thought Mr. Thomas was going to testify against the petitioner. Counsel said that he discussed the case with the attorney who represented Mr. Thomas, and Mr. Thomas' attorney never told him that Mr. Thomas wanted to testify for the petitioner. Counsel stated that he would have been shocked if Mr. Thomas had testified at the petitioner's trial that Mr. Thomas had committed first degree murder. Counsel also noted that he could not compel Mr. Thomas to testify against himself. He could not say whether Mr. Thomas' testimony would have helped at trial.

*Moody v. State*, No. M2015-02424-CCA-R3-PC, 2017 WL 829820, at \*6–7 (Tenn. Crim. App. Mar. 2, 2017).

## III. CLAIMS PRESENTED FOR REVIEW

The petitioner's pro se petition in this court asserts the following claims:

(1) The evidence is insufficient to support his conviction.

(2) Trial counsel was constitutionally ineffective in failing to: (a) prepare for trial; (b) move to sever his trial from that of Mr. Matthews; (c) move for dismissal of all charges after the jury acquitted him of the firearm charge; and (d) challenge the constitutionality of his sentence under *Miller v. Alabama*, 567 U.S. 460 (2012), and *Graham v. Florida*, 560 U.S. 48 (2010).

(3) The trial court erred in failing to act as thirteenth juror.

(4) The trial court erred in failing to allow him to retain counsel of his choice.

(5) The trial court sentenced him unconstitutionally, in light of *Miller* and *Graham*.

(Doc. No. 1 at 6–18.)

## IV. LEGAL STANDARD

The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Upon finding a constitutional error on habeas corpus review, a federal court may only grant relief if it finds that the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Peterson v. Warren*, 311 F. App'x 798, 803–04 (6th Cir. 2009).

AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases . . . and 'to further the principles of comity, finality, and federalism.'" *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 436 (2000)). AEDPA's requirements "create an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings." *Uttecht v. Brown*, 551 U.S. 1, 10 (2007) (citations omitted). As the Supreme Court has explained, AEDPA's requirements reflect "the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)). Where state courts have ruled on a claim, AEDPA imposes "a substantially higher threshold" for obtaining relief than a de novo review of whether the state

court's determination was incorrect. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams v. Taylor*, 529 U.S. 362, 410 (2000)).

Specifically, a federal court may not grant habeas relief on a claim rejected on the merits in state court unless the state decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (d)(2). A state court's legal decision is "contrary to" clearly established federal law under Section 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. at 412–13. An "unreasonable application" occurs when "the state court identifies the correct legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. A state court decision is not unreasonable under this standard simply because the federal court finds it erroneous or incorrect. *Id.* at 411. Rather, the federal court must determine that the state court's decision applies federal law in an objectively unreasonable manner. *Id.* at 410–12.

Similarly, a district court on habeas review may not find a state court factual determination to be unreasonable under Section 2254(d)(2) simply because it disagrees with the determination; rather, the determination must be "'objectively unreasonable' in light of the evidence presented in the state court proceedings." *Young v. Hofbauer*, 52 F. App'x 234, 236 (6th Cir. 2002). "A state court decision involves 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding' only if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support

in the record." *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007) (quoting Section 2254(d)(2) and (e)(1)); *but see McMullan v. Booker*, 761 F.3d 662, 670 & n.3 (6th Cir. 2014) (observing that the Supreme Court has not clarified the relationship between (d)(2) and (e)(1) and the panel did not read *Matthews* to take a clear position on a circuit split about whether clear and convincing rebutting evidence is required for a petitioner to survive (d)(2)). Moreover, under Section 2254(d)(2), "it is not enough for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination." *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011).

The standard set forth in 28 U.S.C. § 2254(d) for granting relief on a claim rejected on the merits by a state court "is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Richter*, 562 U.S. at 102, and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). The petitioner bears the burden of proof. *Pinholster*, 563 U.S. at 181.

Even that demanding review, however, is ordinarily only available to state inmates who have fully exhausted their remedies in the state court system. 28 U.S.C. §§ 2254(b) and (c) provide that a federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has presented the same claim sought to be redressed in a federal habeas court to the state courts. *Pinholster*, 563 U.S. at 182; *Kelly v. Lazaroff*, 846 F.3d 819, 828 (6th Cir. 2017) (quoting *Wagner v. Smith*, 581 F.3d 410, 417 (6th Cir. 2009)) (petitioner must present the "same claim under the same theory" to the state court). This rule has been interpreted by the Supreme Court as one of total exhaustion, *Rose v. Lundy*, 455 U.S. 509 (1982), meaning that each and every claim set forth in the federal habeas corpus petition must have been presented

to the state appellate court. *Picard v. Connor*, 404 U.S. 270 (1971); *see also Pillette v. Foltz*, 824 F.2d 494, 496 (6th Cir. 1987) (exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review"). Moreover, the substance of the claim must have been presented as a federal constitutional claim. *Gray v. Netherland*, 518 U.S. 152, 162–63 (1996).

The procedural default doctrine is ancillary to the exhaustion requirement. *See Edwards v. Carpenter*, 529 U.S. 446 (2000) (noting the interplay between the exhaustion rule and the procedural default doctrine). If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, a petitioner ordinarily is barred from seeking federal habeas review. *Wainwright v. Sykes*, 433 U.S. 72, 81–82 (1977*); see also Walker v. Martin*, 562 U.S. 307, 315 (2011) ("A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment"); *Coleman v. Thompson*, 501 U.S. 722 (1991) (same). If a claim has never been presented to the state courts, but a state court remedy is no longer available (e.g., when an applicable statute of limitations bars a claim), then the claim is technically exhausted, but procedurally barred. *Coleman*, 501 U.S. at 731–32.

If a claim is procedurally defaulted, "federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. The burden of showing cause and prejudice to excuse defaulted claims is on the habeas petitioner. *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999) (citing *Coleman*, 501 U.S. at 754). "'[C]ause' under the cause and prejudice

test must be something external to the petitioner, something that cannot fairly be attributed to him[;] . . . some objective factor external to the defense [that] impeded . . . efforts to comply with the State's procedural rule." *Coleman*, 501 U.S. at 753 (emphasis in original). Examples of cause include the unavailability of the factual or legal basis for a claim or interference by officials that makes compliance "impracticable." *Id.* To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)); *see also Ambrose v. Booker*, 684 F.3d 638, 649 (6th Cir. 2012) (finding that "having shown cause, petitioners must show actual prejudice to excuse their default"). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000). Likewise, if a petitioner cannot establish prejudice, the question of cause is immaterial.

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the United States Supreme Court has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 392 (2004) (citing *Murray v. Carrier*, 477 U.S. 478, 495–96 (1986)); *accord Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006).

## V. ANALYSIS

### A. Sufficiency of the Evidence

The petitioner's "first and foremost" challenge is to the sufficiency of the evidence to support his felony murder conviction. (Doc. No. 15 at 2; Doc. No. 1 at 6.) He argues that his conviction rests entirely upon the testimony of Quontez Caldwell, his half-brother and an uncharged accomplice to the crime who testified under a "use immunity" agreement leveraged by

unrelated felony charges against Caldwell. (Doc. No. 15 at 10.) The petitioner contends that "[t]here is not a single piece of reliable, independent evidence that corroborates the so called accomplice's testimony" (Doc. No. 1 at 6), and that this uncorroborated testimony is further weakened by the jury's verdict acquitting the petitioner of employing a firearm during the commission of the crime. (Doc. No. 15 at 19.) This was his lone contention on direct appeal to the TCCA. (Doc. No. 7-10 at 4, 13–16.)

The TCCA properly stated the standard for appellate review of a claim challenging the sufficiency of the state's evidence as "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Moody*, No. M2011-01930-CCA-R3-CD, 2013 WL 1932718, at *7 (Tenn. Crim. App. May 9, 2013), *perm. app. denied* (Tenn. Oct. 17, 2013) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In accord with this standard, "a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Cavazos v. Smith*, 565 U.S. 1, 6 (2011) (quoting *Jackson*, 443 U.S. at 326)). Thus, a federal habeas court must resist substituting its own opinion for that of the convicting jury, *York v. Tate*, 858 F.2d 322, 329 (6th Cir. 1988), particularly when it comes to matters of witness credibility, which "is an issue to be left solely within the province of the jury." *Knighton v. Mills*, No. 3:07-cv-2, 2011 WL 3843696, at *6 (E.D. Tenn. Aug. 29, 2011) (citing, *e.g.*, *Deel v. Jago*, 967 F.2d 1079, 1086 (6th Cir. 1992)).

In addition to this requirement of deference to the fact-finder's verdict concerning the substantive elements of the crime under state law, this court must defer to the TCCA's consideration of that verdict under AEDPA. *See Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir.

2008) (stating that "the law commands deference at two levels" when adjudicating sufficiency-of-the-evidence claim). The TCCA's consideration of the petitioner's sufficiency-of-the-evidence claim is set out below:

> To sustain appellants' convictions, the State must have proven beyond a reasonable doubt that appellants killed the victim "in the perpetration of or attempt to perpetrate ... first degree murder," as charged in the indictment. Tenn. Code Ann. § 39–13–202(a)(2) (2010). First degree premeditated murder, the underlying felony, is defined as "a premeditated and intentional killing of another." *Id.* at § 39–13–202(a)(1). The jury was instructed that "attempt" meant that one "[a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." *Id.* at § 39–12–101(a)(2).

> Viewed in the light most favorable to the State, a brief synopsis of the facts in this case demonstrates sufficient evidence underlying appellants' convictions. Officer Cote responded to the call at 3652 Chesapeak Drive and was advised by paramedics that a sixteen-year-old female had been shot. After securing the scene, he and Officer Eaves received into evidence a black cap that a witness had found in the street. Officer Cote also retrieved two .45 caliber automatic shell casings and six 9mm shell casings.

> Christopher Bridges testified that as he and Mr. Williams were walking down Chesapeak Drive, a car with four or five people inside of it pulled up, and some of the occupants began shooting. He heard more than five shots fired. He identified a photograph of a vehicle and stated that it appeared to be the vehicle from which the shots were fired. Christopher stated that he had an adequate opportunity to view the car because it passed him and made a u-turn. Mr. Williams also recounted that on April 25, 2009, he was walking to a friend's house with Christopher when he heard gunshots. He recalled telling the police that he saw a small blue or green vehicle that looked like a Honda. He explained that he saw that vehicle before he and Christopher began walking.

> Evan Bridges heard gunshots around 4:00 p.m. on April 25, 2009, and went toward his front yard. When he arrived at the front yard, Evan determined that the gunshots were coming from a small green car that was driving down the street. Approximately fifteen to twenty minutes after the shooting ceased, Evan found a black cap in the middle of the street that was not there before the shooting. He thought that it might have belonged to one of the shooters, so he gave it to the police.

> Quontez Caldwell testified that the vehicle in the picture introduced at trial was appellant Moody's vehicle, and it was the vehicle in which appellant Moody, Mr. Thomas, and some other individuals picked him up that day. He identified appellant

Matthews in the courtroom as one of the other passengers riding in the vehicle. Mr. Caldwell stated that as they drove down Chesapeak Drive, they saw someone with whom they had a disagreement and both appellants and the severed co-defendant began firing shots at him.

On May 15, 2009, Detective Davis conducted a traffic stop in the area of Nolensville Road for a traffic ordinance violation. During a search of the vehicle, he found a loaded 9mm Glock semi-automatic pistol, which appellant Matthews claimed as his own. Detective Cody O'Quinn of the MNPD testified that he was involved in serving a search warrant for a vehicle located at 314 Kern Drive on June 18, 2009. The vehicle was a green 1999 Kia. He determined that the vehicle was registered to appellant Deangelo Moody and his mother.

Detective Brown obtained buccal swabs from both appellants on February 9, 2011. Agent Dunlap analyzed the swabs and compared them to the DNA found on the black cap. From his testing, he determined that ten of the thirteen testing sites indicated that the major contributor of DNA on the cap was appellant Matthews.

Agent Royse received six spent .45 caliber automatic cartridge casings and two 9mm cartridge casings in connection with this case in April 2009. In January 2011, he received a 9mm weapon for comparison and determined that the two 9mm casings provided to him were fired from the weapon he received in January 2011.

Detective Jackson testified that Mr. Caldwell identified appellant Matthews in a photograph array as one of the individuals involved in this shooting. Detective Jackson stated that ultimately, Mr. Caldwell provided seating positions in the vehicle and stated that appellants were two of the three people involved in shooting at Christopher Bridges and Deandre Williams on April 25, 2009.

Based on this evidence, the jury had sufficient evidence to convict both appellants of felony murder perpetrated during an attempt to commit first degree murder. "'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Tenn.Code Ann. § 39–13–202(d) (2010). The jury could have found that appellants formed the intent to kill after appellants and their cohorts passed "C. Trigger," a person with whom they had a disagreement, walking down the street, at which time they made a u-turn in order to confront "C. Trigger." In shooting at "C. Trigger," appellants performed an act intending to cause an element of first degree murder to occur without further action on their part. *Id.* at § 39–12–101(a)(2). However, they missed their intended target and instead shot through the victim's home. "[A] killing in the course of an attempted first degree murder is first degree felony murder. If the prosecution establishes that a defendant attempts to commit the premeditated and deliberate first degree murder of a specific victim but instead kills an unintended victim, the defendant may be guilty of first degree felony murder. This result is plain from the statutory definition

of the crime...." *Millen v. State*, 988 S.W.2d 164, 167–68 (Tenn.1999). As such, neither appellant is entitled to relief on this issue.

*Moody*, 2013 WL 1932718, at *7–9.

This court has reviewed the transcript of the petitioner's trial and finds that the TCCA's decision is supported in the record. The petitioner argues strenuously that no evidence reliably corroborates Mr. Caldwell's testimony that the petitioner was even present at the scene of the crime, much less that he participated in any way as a shooter. (Doc. No. 15 at 16–21.) However, to the extent that Mr. Caldwell was considered an accomplice by the jury, "[t]he rule that a conviction must be supported by more than the uncorroborated evidence of an accomplice is a state-law rule and not one of constitutional dimension." *Beaird v. Parris*, No. 3:14-cv-01970, 2015 WL 3970573, at *13 (M.D. Tenn. June 30, 2015) (citing *United States v. Gallo*, 763 F.2d 1504, 1518 (6th Cir. 1985)).

While the jury acquitted the petitioner on the charge of employing a firearm, it is clear that he need not have fired a gun to be guilty of felony murder. The state proceeded against the petitioner on a theory of criminal responsibility,[2] pursuant to which an accused may be liable if he "in some way associate[s] himself with the venture, act[s] with knowledge that an offense is to be committed, and share[s] in the criminal intent of the principal in the first degree." *Hembree v. State*, 546 S. W. 2d 235, 239 (Tenn. Crim. App. 1976). "The defendant's requisite criminal intent may be inferred from his 'presence, companionship, and conduct before and after the offense.'" *State v. Peebles*, No. 2011-01312-CCA-R3-CD, 2013 WL 2459881, at *5 (Tenn. Crim. App. June

---

[2]       In line with this theory, the jury's verdict of guilt established that either the petitioner or a person for whom he was criminally responsible fired the bullet that accidentally killed the victim. The petitioner thus rightly objects (Doc. No. 15 at 14–15) to the respondent's characterization of the evidence in this case as unequivocally establishing that "Petitioner killed [the victim]" after "attempt[ing] to kill a person with whom he had a disagreement," and that "Petitioner had with him a .40 or .45 caliber weapon" when he "turned the car around and . . . began firing." (Doc. No. 8 at 3, 5, 6.) The court agrees with the petitioner that these characterizations are misleading in light of the proof at trial.

6, 2013) (quoting *State v. McBee*, 644 S. W. 2d 425, 428 (Tenn. Crim. App. 1982)). While the defendant's mere presence during the crime's commission is not sufficient to support a conviction, he need not take a physical part in the crime to be criminally responsible; "encouragement of the principal is sufficient." *State v. Little*, 402 S. W. 3d 202, 217 (Tenn. 2013).

Here, the state produced evidence supporting the finding that the petitioner drove a car resembling the eye witnesses' description of the car from which shots were fired, including the notable feature of a "temporary drive-out tag . . . that . . . would have been valid on the date of th[e] incident." *Moody*, 2013 WL 1932718, at *5. Moreover, "Quontez Caldwell testified that [the petitioner] and Ort[a]go Thomas are his halfbrothers through their father, . . . [and] on April 25, 2009, [the petitioner] and Mr. Thomas picked him up from his grandmother's house in [the petitioner's] vehicle," which Caldwell identified from an exhibit photograph. *Id.* at 3. Caldwell further testified that the petitioner's co-defendant, Martez Matthews, was in the car. *Id.* A cap containing Mr. Matthews' DNA was found at the scene of the crime, and Mr. Matthews was subsequently found in possession of a gun that was used during the attempt on Mr. Bridges' life. *Id.* at 5.

The record evidence clearly does not fail to support the identification of the petitioner as an occupant of the car, nor does it require the finding that he was simply an innocent passenger. There was room for the jury to conclude, as the state argued in closing, that all occupants of the car set out on April 25, 2009 to do harm to Mr. Bridges when they found him and that the petitioner shared in this intent, even if he did not fire a weapon in furtherance of it. (*See* Doc. No. 7-6 at 90–93.) There was testimony that the petitioner ceded the driver's seat in his car to an unidentified individual after picking up Caldwell, and the jury could have concluded that this was done so that he could participate in a more active way in searching for Mr. Bridges. It could also be the case

that the jury, in finding the petitioner guilty on the felony murder charge, credited Mr. Caldwell's testimony that the petitioner fired a weapon, despite acquitting the petitioner on the gun charge. Though such a verdict would be inconsistent, it would not be unconstitutional. Nor does the acquittal on the gun charge affect the review for sufficiency of the evidence supporting the felony murder conviction. As the Supreme Court has explained,

> [I]nconsistent verdicts—even verdicts that acquit on a predicate offense while convicting on the compound offense—should not necessarily be interpreted as a windfall to the Government at the defendant's expense. It is equally possible that the jury, convinced of guilt, properly reached its conclusion on the compound offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the lesser offense. … Sufficiency-of-the evidence review involves assessment by the courts of whether the evidence adduced at trial could support any rational determination of guilty beyond a reasonable doubt. This review should be independent of the jury's determination that evidence on another count was insufficient. … Whether presented as an insufficient evidence argument, or as an argument that the acquittal on the predicate offense should collaterally estop the Government on the compound offense, the argument necessarily assumes that the acquittal on the predicate offense was proper—the one the jury "really meant." This, of course, is not necessarily correct[.]

*United States v. Powell*, 469 U.S. 57, 65 (1984) (internal citations omitted).

In short, despite the petitioner's assertion that the record lacks reliable evidence of his involvement in the crime of conviction, it is the province of the jury to determine the reliability of witness testimony, and Mr. Caldwell's testimony need not be corroborated for purposes of this court's review for sufficiency of the evidence. The court may not rely on its own opinion of the weight due the testimonial and other evidence of the petitioner's involvement, but must defer to the jury's resolution of evidentiary conflicts. Whether the jury's verdict was based on the theory that the petitioner was criminally responsible for the actions of another (with or without having himself fired a gun), or whether it reflects inconsistent findings with respect to the petitioner's employment of a firearm, the evidence was sufficient for a rational juror to find the elements of felony murder beyond a reasonable doubt. The petitioner's claim to the contrary is without merit.

B. <u>Ineffective Assistance of Counsel</u>

      1. <u>Procedurally Defaulted Claims</u>

The petitioner claims that his trial counsel was ineffective in (1) failing to prepare for trial, including by preparing for cross-examination of the state's witnesses and by filing necessary pretrial motions; (2) failing to move to sever the petitioner's trial from that of Mr. Matthews; (3) failing to move for dismissal of all charges in light of the gun charge acquittal; and (4) failing to challenge the constitutionality of his life sentence.[3] (Doc. No. 1 at 8–9.) The respondent asserts that these claims were procedurally defaulted when the petitioner failed to present them to the TCCA on post-conviction appeal. (Doc. No. 8 at 8–9.) The petitioner concedes the procedural default that resulted from his post-conviction counsel ignoring his instructions and failing to present these claims to the TCCA. (*Id.*) As explained in the petition,

> The [post-conviction] trial court granted relief on an issue that the petitioner did not raise, but which was *sua sponte* raised during the evidentiary hearing. The State appealed the decision to grant relief, and petitioner repeatedly corresponded with appointed counsel and repeatedly requested that all issues that had been raised and argued be preserved in the appellate court. Appointed counsel promised, repeatedly, in writing and over the phone, that he would ensure that all issues were raised and preserved.
>
> Counsel failed to raise any of the issues, other than to argue that the trial court did not err in granting relief. Thus, counsel failed to present or preserve the above issues, even in the face of his specific promises to do so.

(*Id.* at 10.) These assertions are borne out in the correspondence attached to the petition (*id.* at 26–45), which documents the petitioner's justifiable fear that any issue not raised before the TCCA would be defaulted; his insistence that counsel either appeal all claims which were denied at the

---

[3]     The petitioner recognizes that this claim presents "an issue of the ineffective assistance of counsel for failing to raise the [sentencing] issue on direct appeal." (Doc. No. 1 at 18.) "The right to the effective assistance of counsel includes the right to the effective assistance of appellate counsel." *Burger v. Prelesnik*, 826 F. Supp. 2d 997, 1011 (E.D. Mich. 2011), *aff'd sub nom. Burger v. Woods*, 515 F. App'x 507 (6th Cir. 2013) (citing *Evitts v. Lucey*, 469 U.S. 387, 396 (1985)). The petitioner's trial counsel also represented him on direct appeal, where the only issue raised was the sufficiency of the evidence.

post-conviction trial level or move to withdraw; and counsel's refusal to comply with these instructions, advising the petitioner that, "[a]s I've told you before, we had to stay on point with the [appellate] brief and stick to why Judge Fishburn was correct in his ruling and argue that he did not abuse his discretion in his ruling." (*Id.* at 39.)

Despite the petitioner's prescience concerning the default of claims not raised before the TCCA, an attorney's error short of constitutional ineffectiveness does not constitute cause excusing a procedural default, whether the error arises from inadvertence, ignorance, or (as here) strategic choice. *Murray v. Carrier*, 477 U.S. 478, 487–88 (1986). The Supreme Court has "explained clearly that 'cause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him." *Coleman v. Thompson*, 501 U.S. 722, 753 (1991), *holding modified by Martinez v. Ryan*, 566 U.S. 1 (2012). Unless the attorney error asserted as cause was made at a stage when the Sixth Amendment right to counsel attached or at the stage presenting the first meaningful opportunity to raise an ineffective assistance of trial counsel claim[4]—and "the Sixth Amendment itself [therefore] requires that responsibility for the default be imputed to the State"—the error cannot be cause excusing a procedural default. This is "because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must bear the risk of attorney error." *Id.* at 754.

The court is certainly sympathetic to the petitioner's frustration here, in light of his post-conviction appellate counsel's failure to follow his very clear instructions. (*See*, *e.g.*, Doc. No. 1 at 34–35.) However, because the petitioner had no right to counsel during the pursuit of his state post-conviction appeal, and because his post-conviction appeal was not his first meaningful opportunity to raise the claims at issue, *see Sutton v. Carpenter*, 745 F.3d 787, 795–96 (6th Cir.

---

[4]     *See Martinez*, 566 U.S. at 10–11.

2014) (holding that under Tennessee procedural law, the *initial* post-conviction proceeding is the first meaningful opportunity to raise ineffective-assistance-of-trial-counsel claim), the "attorney error that led to the default of [these] claims in state court cannot constitute cause to excuse the default in federal habeas." *Coleman*, 501 U.S. at 757.

Even if the court were to find cause excusing the petitioner's procedural default, he has not established prejudice resulting from the claimed errors of counsel. To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995). Review of the trial transcripts does not reveal any lack of vigor in trial counsel's cross-examination of the state's witnesses, nor does it support the petitioner's assertion that counsel "failed to challenge the total lack of corroboration among the testimony of the accomplices, and failed to vigorously argue for acquittal" (Doc. No. 15 at 29); indeed, the transcripts of counsel's closing argument to the jury (Doc. No. 7-6 at 105–13) and the trial court's hearing on the petitioner's motion for a new trial (Doc. No. 7-9) reveal just the contrary. Moreover, the petitioner does not specify any prejudice resulting from counsel's allegedly deficient pretrial preparation or motion practice. The petitioner argues that prejudice should be presumed from counsel's failure to move to sever his trial from that of "a codefendant who was found in possession of what is arguably the weapon which fired the bullet which killed the victim in this case," (Doc. No. 15 at 32–33) when such evidence would not have been admissible at a severed trial (Doc. No. 1 at 9). But the petitioner does not cite any authority for this proposition, and the court finds none. *See Mayhew v. State*, No. W2013-00973-CCA-R3PC, 2014 WL 1101987, at *8 (Tenn. Crim. App. Mar. 19, 2014) (finding no prejudice from counsel's decision to forego motion to sever, despite introduction of DNA evidence linking co-defendant to the crime scene; "Given the 'close connection' of the 'time, place, and occasion'

of the Petitioner and his co-defendant's crimes in this case, 'it would be difficult to separate proof of one charge from proof of the others.'") (quoting Tenn. R. Crim. P. 8(c)(3)); *see also Black v. State*, 794 S.W.2d 752, 758 (Tenn. Crim. App. 1990) (finding that a joint trial "contemplates that evidence may be admitted against one or more defendants which is not necessarily applicable to other defendants.") (citations omitted).

Finally, any argument for prejudice resulting from counsel's failure to challenge the constitutionality of the petitioner's sentence, based on the claim that it effectively precludes the possibility of parole, is foreclosed because the Supreme Court has only held unconstitutional "a sentencing scheme that *mandates* life in prison without possibility of parole for juvenile offenders," *Miller*, 567 U.S. at 479 (emphasis added), and the Tennessee statutory scheme under which the petitioner was sentenced "permits release eligibility after serving fifty-one years." *State v. Polochak*, No. M2013-02712-CCA-R3CD, 2015 WL 226566, at *34 (Tenn. Crim. App. Jan. 16, 2015); *see Starks v. Easterling*, 659 F. App'x 277, 280 (6th Cir. 2016), *cert. denied*, 137 S. Ct. 819 (2017) (denying habeas relief to petitioner who received life sentence for felony murder, "which in Tennessee requires an individual to serve fifty-one years in prison before eligibility for parole," "[b]ecause the Supreme Court has not yet explicitly held that the Eighth Amendment extends to juvenile sentences that are the functional equivalent of life" without parole). Because the petitioner's life sentence was the minimum sentence mandated by state law, Tenn. Code Ann. § 39-13-202, and federal law does not preclude its imposition upon a juvenile so long as parole is possible, it cannot be said that counsel's failure to challenge the sentence actually prejudiced the petitioner.

In sum, the petitioner's claims of ineffective assistance of counsel were defaulted before the state courts, and he has failed to demonstrate cause and prejudice excusing the default. These claims are therefore barred from federal habeas review.

### 2. Ineffective Assistance Claim Presented to the TCCA

The only issue of ineffective assistance of counsel considered by the TCCA—"that counsel was ineffective concerning co-defendant Ortago Thomas" "for failing to interview Mr. Thomas or call him as a witness at trial," *Moody v. State*, No. M2015-02424-CCA-R3-PC, 2017 WL 829820, at *5, 7 (Tenn. Crim. App. Mar. 2, 2017)—is not explicitly raised in the petition before this court. However, the court liberally construes the petition as raising this claim as part of the contention that counsel failed "to investigate." (Doc. No. 1 at 8.) The post-conviction trial court awarded relief on this issue, but was reversed by the TCCA.

All federal claims of ineffective assistance of counsel are subject to the highly deferential two-prong standard of *Strickland v. Washington*, 466 U.S. 668 (1984), which asks: (1) whether counsel was deficient in representing the defendant; and (2) whether counsel's alleged deficiency prejudiced the defense so as to deprive the defendant of a fair trial. *Id.* at 687. To meet the first prong, a petitioner must establish that his attorney's representation "fell below an objective standard of reasonableness," and must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that . . . the challenged action 'might be considered sound trial strategy.'" *Id.* at 688–89. The "prejudice" component of the claim "focuses on the question of whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). Prejudice, under *Strickland*, requires showing that "there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

As discussed above, however, a federal court may not grant habeas relief on a claim that has been rejected on the merits by a state court, unless the petitioner shows that the state court's decision "was contrary to" law clearly established by the United States Supreme Court, or that it "involved an unreasonable application of" such law, or that it "was based on an unreasonable determination of the facts" in light of the record before the state court. 28 U.S.C. §§ 2254(d)(1) and (2); *Williams v. Taylor*, 529 U.S. 362, 412 (2000). Thus, when an exhausted claim of ineffective assistance of counsel is raised in a federal habeas petition, the question to be resolved is not whether the petitioner's counsel was ineffective. Rather, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter*, 562 U.S. at 101. As the Supreme Court clarified in *Harrington*,

> This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Id.* (internal quotation marks and citation omitted).

The TCCA correctly identified and summarized the *Strickland* standard applicable to this claim. *Moody*, 2017 WL 829820, at *8–10. Accordingly, the critical question is whether the state court applied *Strickland* reasonably in reaching the following conclusions:

> After our thorough review, we conclude that the post-conviction court erred in granting the petitioner relief based on ineffective assistance of counsel. In

determining that trial counsel's performance was deficient, the post-conviction court found that counsel was aware that Mr. Thomas wanted to testify for the petitioner. However, there is nothing in the record to support this finding. Mr. Thomas testified at the hearing that he told the petitioner that he wanted to testify, but the petitioner never testified that he received this information or conveyed it to counsel. Counsel testified that he would have been "shocked" if Mr. Thomas' attorney told him that Mr. Thomas would testify and admit to murder. Absent a showing that counsel knew that Mr. Thomas was willing to testify for the petitioner, it was reasonable for counsel to believe that Mr. Thomas, a co-defendant charged with first degree murder, would not incriminate himself if called to testify. Any finding that counsel was aware of Mr. Thomas' willingness to testify is pure speculation.

Moreover, it was not unreasonable for trial counsel not to interview Mr. Thomas prior to trial because counsel spoke to Mr. Thomas' attorney and the attorney never mentioned that Mr. Thomas was willing to testify for the petitioner, and there is nothing in the record to suggest that Mr. Thomas' attorney would have allowed Mr. Thomas to speak to counsel and implicate himself in the murder. Furthermore, even if counsel had been aware that Mr. Thomas wanted to testify, his proposed testimony that the petitioner was unaware of what was going to happen would have likely been inadmissible as speculation. Thus, only Mr. Thomas' proposed testimony that the petitioner did not fire a weapon would have been admissible. Therefore, it would have been reasonable not to call Mr. Thomas as a witness because his testimony would have added little value to the case and been subject to impeachment based on Mr. Thomas' multiple prior statements to police. We conclude that trial counsel did not render deficient performance.

Although we have determined that trial counsel's performance was not deficient, the bigger issue and basis for us to overrule the court below is that the post-conviction court did not make the proper analysis in determining whether the petitioner was prejudiced. In finding prejudice, the court stated that "the point is not whether [Mr. Thomas'] testimony would have been accepted or rejected. Rather, the point is that the jury was never allowed to hear from the witness." The court later discussed whether the jury would have accepted Mr. Thomas' claim that the petitioner did not know a shooting was going to occur and stated "there is no way to know." These statements do not support a finding of prejudice because the appropriate standard for determining prejudice is whether there is "a reasonable probability . . . that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Applying the correct standard, we cannot conclude that there is a reasonable probability that the result of the trial would have been different had Mr. Thomas testified. Mr. Thomas testified at the post-conviction hearing that his testimony essentially would have been that the petitioner did not have or fire a weapon, but that evidence was already presented to and apparently accepted by the jury in acquitting the petitioner of the weapon charge. The post-conviction court even

noted that Mr. Thomas' testimony "mirror[ed] the jury's verdict that Petitioner was not a shooter."

Even with Mr. Thomas' testimony, the evidence established that the petitioner was in the car at the time the shots were fired and the car was registered to his mother. The evidence also indicates some awareness on the petitioner's part of what was going to happen considering Quontez Caldwell's testimony that, while they were in the car, one of the passengers said, "There go [sic] somebody we beefin' with [sic]," and the driver made a U-turn to go back toward the individuals. In light of Mr. Thomas' limited proposed testimony that the petitioner was not the shooter, the fact that the State prosecuted the petitioner under a theory of criminal responsibility and the fact that Mr. Thomas' testimony would have been impeached support a finding that there was no reasonable probability that the result of the trial would have been different had Mr. Thomas testified.

*Id.* at *10.

The TCCA reasonably analyzed this issue and determined that counsel was not ineffective under *Strickland*. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. Counsel's decision not to interview a co-defendant does not necessarily amount to unreasonable investigation, particularly if that decision is made after speaking with the co-defendant's attorney. *See U.S. v. Gavin*, 77 F. Supp. 3d 525, 529 (S.D. Miss. 2014) (stating that "*Strickland* does not require the interview of every potential witness," and finding that counsel used reasonable professional judgment in declining to interview co-defendant after discussion with co-defendant's counsel). As recited above, the TCCA highlighted the communication between defense attorneys —who "spoke frequently . . . because they shared office space" (Doc. No. 7-15 at 15) and "had quite a bit of discussion about the case" (Doc. No. 7-18 at 23)—and the lack of any evidence that Thomas's attorney informed the petitioner's attorney of Thomas's availability as a witness. The TCCA also properly pointed to the lack of any record evidence that counsel otherwise knew of Thomas's professed desire to testify for the petitioner and, in so doing, incriminate himself. The TCCA's finding that the petitioner's counsel did not render deficient performance in failing to

interview Thomas in the presence of his attorney or to call him to testify was thus based on a reasonable application of *Strickland*, which requires that a decision not to investigate be "assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." 466 U.S. at 691; *see Stewart v. Wolfenbarger*, 468 F.3d 338, 352 (6th Cir. 2006) (finding no deficiency in failure to call uncharged accomplice to testify, as it is not reasonable to expect that accomplice would forego his Fifth Amendment right against self-incrimination and implicate himself to deflect suspicion from petitioner).

The TCCA also reasonably applied *Strickland* in finding no reasonable probability that the result of the proceeding would have been different if not for counsel's failure to interview or call Thomas to testify, "[i]n light of Mr. Thomas' limited proposed testimony that the petitioner was not the shooter, the fact that the State prosecuted the petitioner under a theory of criminal responsibility and the fact that Mr. Thomas' testimony would have been impeached." *Moody*, 2017 WL 829820, at *10. Because the state court reasonably found that neither prong of the *Strickland* test for ineffective assistance was satisfied, the petitioner is not entitled to habeas relief on this claim.

C. Remaining Claims

The petitioner's remaining claims—that the trial court erred in failing to act as thirteenth juror, in failing to allow him to retain counsel of his choice, and in giving him a sentence that is functionally equivalent to life without the possibility of parole—were not presented to the TCCA and are therefore defaulted. The petitioner does not attempt to demonstrate cause and prejudice excusing the default, aside from citing the failures of his post-conviction appellate attorney which, again, cannot establish cause for the default because they are attributable to the petitioner. These claims are therefore barred from review in this court.

Although the petitioner concludes his petition by referring to his "actual[] innocen[ce] of the crime he has been convicted of" (Doc. No. 1 at 21), the court finds no grounds for excusing his procedural default on this basis. To establish actual innocence as a gateway to substantive review of a procedurally barred claim, the petitioner must demonstrate that, "in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Bousley v. United States*, 523 U.S. 614, 623 (1998) (quoting *Schlup v. Delo*, 513 U.S. 298, 327–28 (1995) (internal quotation marks omitted). Importantly, "'actual innocence' means factual innocence, not mere legal insufficiency" of the proof against the petitioner. *Id.* Therefore, this narrow exception to the procedural default bar "must be based on reliable evidence not presented at trial." *Calderon v. Thompson*, 523 U.S. 538, 559 (1998). Such evidence "can take the form of 'exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence.'" *Chavis-Tucker v. Hudson*, 348 F. App'x 125, 133 (6th Cir. 2009) (quoting *Schlup v. Delo*, 513 U.S. 298, 324 (1995)). This standard "does not require absolute certainty about the petitioner's guilt or innocence," but it is a demanding standard that "permits review only in the extraordinary case." *House v. Bell*, 547 U.S. 518, 538 (2006). In determining whether the standard is met, "the habeas court may have to make some credibility assessments." *Chavis-Tucker*, 348 F. App'x at 133.

While the petitioner's conclusory reference to his actual innocence does not justify further consideration of his defaulted claims under this standard, the post-conviction testimony of Ortago Thomas could conceivably fit the bill. Upon scrutiny, however, this eyewitness testimony that the petitioner was an innocent passenger in the vehicle from which the fatal shot was fired cannot be deemed "reliable" or "trustworthy." Thomas testified that he was the petitioner's brother, that he initially lied to police by denying any involvement in the shooting, and that after the petitioner's conviction he pled guilty to a reduced charge of second-degree murder in exchange for a fifteen-

year prison sentence. Thomas further testified that three of the car's passengers were armed, that three guns were fired by two passengers (Thomas with his own gun, and Caldwell with his gun and a gun belonging to Matthews), and that the petitioner was not involved and could not have known that a shooting was going to occur because he did not have a gun. (Doc. No. 7-18 at 3–17.) The credibility of this testimony about the petitioner's innocence is undermined by Thomas's relation to the petitioner, his admission to lying to police, and his criminal conviction; therefore, a reasonable juror could easily conclude that Thomas is an unreliable eyewitness. *See Chavis-Tucker*, 348 F. App'x at 134–35. Furthermore, although Thomas's testimony at the petitioner's post-conviction hearing is the only eyewitness account identifying Caldwell as a shooter, there was ample evidence at the petitioner's trial from which the jury could have drawn this inference in spite of Caldwell's contrary testimony and the lack of other eyewitness accounts. The court finds that the petitioner is not entitled to an exception, based on actual innocence, to the requirement of showing cause excusing his procedural default.

Even if the default could be excused, the petitioner would not be entitled to relief on any of the three remaining grounds of his petition. First, his claim that the trial court erred when it failed to act as thirteenth juror under Tennessee Rule of Criminal Procedure 33 (Doc. No. 15 at 34–35) is explicitly a matter of state law and therefore not cognizable on habeas review. *See Nash v. Eberlin*, 258 F. App'x 761, 764 n.4 (6th Cir. 2007) (unless properly construed as challenging sufficiency of the evidence, a claim that conviction was against manifest weight of the evidence is a state law claim not subject to federal habeas review); *Williams v. Easterling*, No. 3:09-cv-1002, 2010 WL 3463728, at *8 (M.D. Tenn. July 14, 2010), *report and recommendation adopted sub nom. Williams v. Eastering*, No. 3:09-1002, 2010 WL 3463726 (M.D. Tenn. Sept. 2, 2010) (deferring to state court's interpretation of requirements of Tenn. R. Crim P. 33).

Second, the denial of the petitioner's motion for continuance so that newly retained counsel could prepare for trial—which was filed four days prior to the scheduled beginning of the trial, when his co-defendant, the state, and his appointed counsel were ready to proceed, and after the trial had previously been continued from its original setting—did not amount to an unconstitutional deprivation of chosen counsel. The trial court denied the continuance motion in light of the late date of its filing and the fact that, despite complaining to the trial court about his appointed attorney, the petitioner had not previously informed the court that he or his family was attempting to retain private counsel. (Doc. No. 7-15 at 28); *see Burton v. Renico*, 391 F.3d 764, 772 (6th Cir. 2004) (denial of a continuance rises to the level of a constitutional violation only when circumstances show that denial was "unreasoning and arbitrary" and actually prejudiced the defense). Although the Sixth Amendment guarantee of counsel for an accused's defense carries with it the right to be represented by counsel of one's own choice, which may not be arbitrarily and unreasonably interfered with, this right is not absolute and may not be used to unreasonably delay trial. *Linton v. Perini*, 656 F.2d 207, 208–09 (6th Cir. 1981). There is no indication here that the trial court arbitrarily denied a continuance when the requested continuance would have made previously unavailable witnesses available or otherwise benefitted the defense in any measurable way. *Burton*, 391 F.3d at 772; *Powell v. Collins*, 332 F.3d 376, 396 (6th Cir. 2003).

Finally, and as previously discussed, federal law does not prohibit the state from sentencing a juvenile such as the petitioner to life with the possibility of parole, even though parole is only possible after service of 51 years in prison. *See Starks v. Easterling*, 659 F. App'x at 280; *see also Ali v. Roy*, ---F.3d----, 2020 WL 812916, at *3 (8th Cir. Feb. 19, 2020) (rejecting claim under *Miller* and denying habeas relief to juvenile petitioner who was not sentenced to life without parole, but to three 30-year sentences).

# VI. CONCLUSION

For the foregoing reasons, the habeas corpus petition will be denied and this matter will be dismissed with prejudice.

The court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a Section 2254 petitioner. Rule 11, Rules Gov'g § 2254 Cases. A petitioner may not take an appeal unless a district or circuit judge issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A COA may issue only if the petitioner "has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2). A "substantial showing" is made when the petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (citations and internal quotation marks omitted). "[A] COA does not require a showing that the appeal will succeed," but courts should not issue a COA as a matter of course. *Id.* at 337.

Reasonable jurists could debate whether the petitioner's undefaulted claim of ineffective assistance of counsel has merit, and whether his showing of actual innocence via Ortago Thomas's testimony is sufficient to excuse his procedural default. The court will therefore grant a certificate of appealability on these issues. The court will deny a COA on the rest of the petitioner's claims, but he may seek a COA directly from the Sixth Circuit Court of Appeals. Rule 11(a), Rules Gov'g § 2254 Cases.

An appropriate order is filed herewith.

Aleta A. Trauger
United States District Judge